M. MARVEL, Administratrix of the Estate of Margaret Price McNeal, Deceased,

*Plaintiff and Appellant,*

vs.

H. M. PURSEL, doing business under the trade name and style of Sharrock-Pursel, Contractors, and James Orr,

*Defendants and Respondents.*

M. MARVEL, Administratrix of the Estate of Linda Lou Price, Deceased,

*Plaintiff and Appellant,*

vs.

H. M. PURSEL, doing business under the trade name and style of Sharrock-Pursel, Contractors, and James Orr,

*Defendants and Respondents.*

(Nos. 2403 and 2404; February 8th, 1949; 202 Pac. (2d) 656)

For the Plaintiffs and Appellants, the causes were submitted upon the briefs and also oral arguments of Edward E. Murane of Casper, Wyoming.

For the Defendants and Respondents, the causes were submitted upon the briefs and also oral argument of William J. Wehrle and Charles M. Crowell, both of Casper, Wyoming.

## OPINION.

BLUME, Justice.

On the night of November 18, 1946, after dark, Thomas McNeal, 30 years of age and a government trapper, was driving a Ford coupe on Highway 20 westward. He carried in his car a can of liquid with a strong scent which was subsequently noticed at or near the place of the collision hereafter mentioned. With Thomas McNeal, and in the front seat of the Ford car, was his wife, Margaret Price McNeal, about 24 years of age, and in the back seat of the car was the child of Margaret Price McNeal by a former marriage, aged about three to four years, whose name was Linda Lou Price. At the same time, James Orr, one of the defendants herein was driving eastward a ten-ton 1945 White truck and flatbed body with dual wheels for the defendant H. M. Pursel. The truck and the Ford car collided on a curve of the road about 45 miles west of Casper and all the occupants of the Ford car were instantly killed. The degree of the curve is not shown. Thereafter, M. Marvel, Administratrix of the Estate of Margaret Price McNeal, brought an action in the District Court of Natrona County for damages in the sum of $30,000, and also brought a separate action as administratrix of the

estate of the child to recover damages in the sum of $35,000, alleging as negligence that the driver of the truck did not have the truck under control; that he traveled at an excessive rate of speed, and that he drove on the wrong side, or the north side, of the highway. We might mention in this connection that it is not now claimed that Orr drove at an excessive rate of speed or that he did not have his truck under control. It appears that he traveled at the rate of approximately 50 miles an hour. The Ford car had traveled at the rate of 25 or 30 miles an hour sometime previously, but the rate of speed at the time of collision is not shown. On motion, the court consolidated the actions for the purpose of trial. A jury was duly impaneled, and at the close of the evidence on the part of the plaintiffs, the defendants moved for a directed verdict in their favor, which motion was sustained by the court, a verdict was returned as directed, and judgment was rendered for the defendants. From that judgment, an appeal has been taken to this court.

I. Negligence of Defendants.

. The main and practically the only witness in the case on the question of negligence of the defendants was one William G. Thompson, a trucker who traveled eastward a short distance behind Orr and arrived within two or three minutes after the collision had taken place. He found the truck and the Ford car, as he testified, on the south side of the road. The wheels of the Ford car were wedged in between the wheels of the truck and the wheels of the truck were on the running board of the Ford car. In other words, the truck was on top of the car, and the collision was as straight a head-on collision as can be imagined. Thompson asked Orr how the accident happened, and the latter stated, "I don't know. I just couldn't avoid

it." Orr also stated that his reflectors were out; that they were hit so hard that they flew from the truck. The right front wheel of the truck and part of the automobile were on the south shoulder of the road or very close to it. The truck stood at somewhat of an angle, with the rear wheels, according to Thompson, on approximately the center line of the road. The three persons in the Ford car were found to be dead. A patrolman from Casper was called, who arrived on the scene perhaps about two hours later, and who brought with him the witness Flood, a photographer, who took a number of pictures of the truck and the car after coming to rest, and the highway. Four of these were introduced in evidence by the plaintiff. Exhibit 1 shows the rear of the truck and part of the automobile under it, and it further shows a man in the foreground of the picture and three men in the background, one of whom was patrolman Collier. None of the men in the background were produced as witnesses in the case. Exhibit 2 shows the right front of the truck and the car underneath as well as some fluid under the truck. Exhibit 3 shows the left front view of the truck and the car under it with the left front wheels of the truck on the right running board of the automobile and a black mark to the right showing some fluid. Exhibit No. 4 shows the left front of the truck and the right side of the Ford and also some fluid underneath the truck. Two more pictures were taken by Flood the next morning but they merely show the highway. The width of the highway was 21½ feet, sloping downward to the north. According to Thompson, the point of impact was approximately 117 feet west of the place where the truck and the car came to rest. He judged the point of impact by some fluid and debris found on the highway.

There is no direct evidence that the truck driver was on the wrong or north side of the highway at the

time of the collision. If he was, it must be inferred from the facts and the circumstances shown in the evidence. Counsel for the plaintiffs thinks that such inference may be made by reason of (a) skid marks found by Thompson, (b) the position of the truck on the highway after it came to rest, (c) some fluid found at the point judged by Thompson to have been the place of impact, and (d) some debris found at approximately the same place. These matters will be considered separately.

Thompson testified that he found some skid or tire marks made by dual tires about the middle of the south part of the highway and approximately 18 inches long and some 15 feet west of the point where he found debris. Counsel for plaintiffs says: "With the truck being 8 feet wide and it being 10 feet to the center of the highway, and the marks in the center of the south side of the highway, this would show that the left side of the truck was three feet to the north of the center of the highway at the moment of impact." That is a pure assumption. No corresponding skid or tire marks were found on the north side of the highway, as would naturally be expected if the assumption were true. There is no evidence as to when, how, or by whom these marks on the south side of the highway were made. It is too speculative to base any reasonable inference upon the testimony mentioned above.

Counsel for the plaintiff states that the right rear wheels of the truck as shown in Exhibit No. 1 were 2½ to 3 feet north of the south shoulder of the highway, that is to say, north of the south side of the oiled mat. The exhibit does not, so far as we can see, show the south line of the oiled mat, and, in the absence of other evidence, we cannot say that the assertion of counsel is true. The truck, according to Thompson, stood at an angle with the left rear wheels approxi-

mately at the center of the highway. Automobiles and trucks had no difficulty in passing on the north side of the road. Counsel for defendants argue that inasmuch as one half of the highway was 10¾ feet in width, it follows that if the right wheel of the truck was 2½ feet north of the south side of the oiled mat, the whole of the truck was south of the center line of the highway. But that does not necessarily follow. It depends upon the degree of the angle at which the truck stood and the length of the truck. Neither of these facts are shown. However, with the truck dragging the automobile in front of it, it cannot, we think, be surprising that the rear of the truck swerved somewhat to the north. Since the road sloped downward to the north, we could hardly have expected the truck to be further south than it was. In fact, it would seem that, with the road sloping as it did, on a curve, and with the truck probably out of control after the terrific impact, it would not have been surprising to have found the whole of the truck, or at least a large part of it, on the north side, rather than on the south side, of the highway, if it, at the time of the collision had been on the north side thereof. In any event, we cannot see that the location of the truck at the time when it had come to rest warrants the inference that it was traveling on the wrong side of the road at the time of the collision.

The witness Thompson testified at length as to fluid found on the highway after the collision. Part of it appears to have been fluid which came out of the can in the trunk of the automobile and which had a strong odor, as heretofore mentioned. Part of it consisted of radiator fluid. The witness was uncertain as to whether or not there was oil from the crankcase. He testified that the dish, dip or slope of the curve where the collision occurred was to the north so that all fluid would run in that direction. That fact itself accord-

ingly would be no indication as to the location of the truck at the time of the collision. The witness particularly testified in reference to fluid on Exhibit 1. That exhibit, as already mentioned, shows the rear of the truck, a man standing in the foreground, and three men, including the patrolman, in the background of the picture. It seems that some of the fluid escaped to the right as well as to the left of the truck after it came to rest. The witness further testified in part as follows:

"Q. And did you see anything on the highway that would indicate where the units came together?

A. Well, there was fluid and there was dirt, both from one or the other of the vehicles on the road, which marked it pretty plain.

Q. And you mentioned the matter of liquid from the radiator—does that picture show any such liquid?

A. There is a dark line here.

Q. Would you please stand and indicate that to the jury?

A. (Indicating) This dark line here, as shown.

Q. Would you follow it from where it shows in the picture, up to where it disappears under the truck?

A. It first starts here, (indicating), and as far as you can see back under the truck.

Q. Will you show it to the juror on the end, please? Where was the first evidence of the liquid which is shown in that picture? (In Exhibit No. 1).

A. Today, I would say it is about where that man is standing.

Q. Right in the immediate foreground of the picture?

A. Yes.

Q. Where is that, with reference to the north side or the south side or the center of the highway?

A. It looks like the center to me.

Q. Can you trace the liquid from the approximate point of impact, to where the vehicles came to rest?

A. Yes.

Q. Can you do that on this picture, Exhibit 1?

A. Yes.

Q. Was that what you indicated as starting in the immediate foreground of the picture, where this figure is, up to underneath the truck?

A. That is right."

The witness then was handed Exhibit 4 which shows the left front of the truck as it was at rest after the collision, and the testimony of the witness on this is as follows:

"Q. Now, I will refer you to this picture and ask you whether or not this dark spot on the right side of the picture is a continuation of the line you testified to in Exhibit 1?

A. It is.

Q. And what made that, if you know?

A. It is liquid from one or the other of the vehicles.

Q. Liquid from the vehicles, and will you indicate with a pencil to the jury, that particular liquid you refer to and also the liquid as shown as coming out of the vehicle? You are indicating underneath the truck, are you?

A. Yes, sir."

The witness was then shown Exhibit 3 which shows the left front view of the truck, and his testimony in that connection was as follows:

"Q. Does the liquid, the radiator liquid you have testified to, show, or any markings of it show in that picture?

A. Yes, sir.

Q. Is it the same mark or line as shown and testified to in Plaintiff's Exhibit 1, which starts and comes under the truck from the rear?

A. Yes, sir.

Q. And does that picture also show some other liquid or fluid on the highway?

A. Yes, sir, it shows liquid crossing the highway.

Q. Will you indicate to the jury, first the mark that you refer to as radiator liquid, and second, the other fluid flowing across the highway?

A. There is the first one, (indicating) and there is the one going across the highway. This is the portion under the truck and this is the portion flowing across the highway.

Q. Did any of the traffic go through this fluid that was flowing out of the car after they had come to a rest?

A. All traffic had to go through it.

Q. I refer again to Plaintiff's Exhibit 1, and ask you if that is shown on that exhibit. If so, will you please indicate it?

A. It is. There is the signs of it here, (indicating) the marks.

Q. Will you please show that to the jury, as to the traffic tracks made in that fluid as it went through it?

A. There is tracks going through that fluid as it run across the highway. (Indicating). There are marks from passing trucks."

We have been unable to perceive how the fluid which came from under the truck on the right and on the left as in shown in Exhibits 1, 2, 3 and 4 throws any light on the location of the truck at the time of the collision. The witness Thompson indicated a dark line on Exhibit 1 as showing liquid on the highway without identifying marks on the picture and noting them in the record. That sort of evidence gives this court no information, leaving the trial judge who saw the indication in a much better position than this court to determine the force and effect of that testimony. The witness stated that the liquid "started" in Exhibit 1 in the foreground of the picture where a man with his back to the one viewing it was standing and that

this looked like the center of the highway to him, and that this line, the dark line, could be traced back 10 or 12 feet west of the picture to the place of the collision. We do not know what the witness meant by "starting." Perhaps he meant to refer to the flow of the liquid from south to north. There are many dark lines on Exhibit 1, but if we are right in our conjecture as to the line of liquid indicated by the witness as being the dark line between the rear wheels of the truck, then in view of the testimony of the witness that the rear left dual wheels were at the approximate center of the highway, the line of fluid was between that approximate center and some distance to the right or south therefrom. We do not know that distance— possibly two feet. We cannot, in any event, infer from this testimony that the truck was astraddle of the center of the highway at the time of the collision unless we knew from which part of the radiator the fluid made its exit and which course it took from there. Counsel for plaintiffs apparently assumes that there was a break at or near the center of the radiator of the automobile from which the fluid made its exit directly to the ground, but we are unable to see how we should be justified in adopting such assumption in the absence of even the slightest evidence on the point. And in this connection, we must not forget that the dip or dish of the highway was to the north. An examination of the radiator after the wreck might have thrown some light on the subject. Counsel's brief does not illuminate the point before us. We have the bare assertion that the witness Thompson "specifically places the point of impact as in the center of the highway." Taking all of the facts on the subject into consideration, we are unable to say that the trial judge misinterpreted them.

Some debris, consisting of parts of the automobile and truck, was found, according to the witness Thomp-

son, in the approximate center of the highway. He identified clutch and transmission parts. Cars and trucks were passing on the north side of the highway, so he kicked off the debris, as he testified, to the north. To describe the place where the debris was located as the approximate center of the highway is not as satisfactory as it might be. There was no marked center line, as the witness Thompson stated, nor was all the debris kicked off the road, for the brother of Tom McNeal testified that he saw some of it the next morning without being able to state the location of the collision. Hence, the patrolman must have been able to see some of the debris after he came on the scene. Counsel for the plaintiffs apparently maintains that in view of the fact that the debris was found in the approximate center of the road shows that the truck was partially on the wrong side. That is evidently on the theory that the parts of the vehicles fell straight down at the place where they were at the moment of impact. That might be a fair inference under some circumstances, but, in this instance, the impact must have been terrific. Nearly all parts of the Ford car must have been twisted. Parts doubtless were jammed together. A slight angle of the impact caused by the turning of the steering wheel or otherwise could easily have thrown the parts from the vehicles to the north. A close examination of the various parts of the wrecked automobile might have disclosed valuable information, but there is no evidence that such examination was made. A person experienced in seeing automobile collisions might be able to tell where the debris might have fallen, but we are in doubt in view of the meager information before us, and cannot say that the trial judge committed error in not submitting the case to the jury.

What has enhanced our doubt on the subject before us, or perhaps created some of the doubt, is the fact

that patrolman Collier who investigated the wreck in this case was not called as a witness, and no explanation for the failure to do so appears in the record. Patrolmen are employees of the state to enforce its motor vehicle laws. Sections 60-903, 60-904, W. C. S. 1945. They customarily investigate automobile wrecks. Presumably they are experienced men in that connection. According to the witness Thompson, patrolman Collier made measurements on or about the scene of the collision. Instead of stating approximate locations and distances, he doubtless would have been able to state exact locations and distances. He could perhaps have explained many of the matters which are in doubt herein. He undoubtedly was the best qualified and most competent witness that could have been called in the case, and the inference inevitably arises in one's mind that his testimony would not have sustained the contentions of the plaintiffs herein. It is stated in 31 C. J. S. 853 and subsequent pages, as follows:

"The failure of a party to call a witness may, * * * give rise to an inference that the testimony of such uninterrogated witness would not sustain the contention of the party. In the absence of explanation, the failure to call a witness may create such an inference against such party where the witness is available and where the witness or witnesses possesses a peculiar or special knowledge concerning facts essential to a party's case."

Section 60-506 W. C. S. 1945 provides, as correctly called to our attention by counsel for the plaintiffs, that a driver on the highway must promptly turn to the right of the center of the traveled road whenever he is about to meet another vehicle traveling in the opposite direction. That is of course for the protection of the driver who meets him and who travels on his own side of the road. It is said in Vol. 2, Page 754, Restatement of the Law of Torts, as follows:

"A statute or ordinance requiring all persons to drive on the right side of the road may be construed as subject to an exception permitting travellers to drive upon the other side, if so doing is likely to prevent rather than cause the accidents which it is the purpose of the statute or ordinance to prevent."

It is admitted in the case at bar that the Ford car was traveling on the wrong side of the road. It is possible that the driver of the truck, knowing that fact, believed that he found himself in the same situation as the driver of the car who turned to the left rather than to the right in the case of O'Malley vs. Eagan, infra. What was he to do? It may be that he then turned to his left for the express purpose, if he could, to avoid a collision. Since we know nothing whatever of the circumstances, it is difficult to see how the court can say that he was negligent, and it would seem that something aside from merely being on the north side of the road should have been shown in order to attribute negligence to him. In view of what we have said otherwise, it is not necessary to rely on that point herein, but it has contributed to our doubt that the trial judge was wrong in his action. We have examined the case of Farrell vs. Cameron, 98 Utah 68, 94 Pac. 2d 1068, and do not think that that case is in point herein.

II. Proximate Cause.

Counsel for the defendants maintain that even if the truck driver was somewhat on the wrong side of the road, nevertheless his negligence was not the proximate cause of the death of the occupants of the automobile. Counsel for the plaintiffs argues that while the driver of the automobile was negligent, still, in the absence of any negligence on the part of the truck driver, the collision would not have occurred in exactly the same manner as it did. Negligence on the part of a driver does not necessarily show that his negligence

is the proximate cause of an injury. That rule is fully discussed in the case of O'Malley vs. Eagan, 43 Wyo. 233, 2 Pac. 2d 1063, 77 A. L. R. 582 and the annotation to that case commencing in 77 A. L. R. page 598. The writer hereof has deemed it best to consider the point, without committing the court thereon, thinking that the case at bar presents as good an illustration as, or better than, any that can be found in any of the books. There is no testimony as to the dimensions of the Ford car, but let us assume that it was of the not unusual width of other automobiles, namely, of an overall width of approximately 68 inches, and the width between the outside of the right wheel to the outside of the left wheel approximately five feet. The width of the truck was eight feet. Since the wheels of the automobile were wedged in between the wheels of the truck, the distance between the inside of the wheels of the truck to the outside would be not to exceed three feet, or one foot and one-half on each side of the truck. While there is no evidence showing the distance that the truck was over the center line to the north, if any, let us assume for the purposes of this case that it might have been north of the center line, that is to say on the wrong side, one foot, two feet, and three feet—the farthest contended for by counsel for the plaintiffs. That assumption is made for the purposes of determining how far the Ford car was on the south side, that is to say the wrong side, of the road on any theory advanced by counsel for the plaintiffs. In the first of these cases, the whole of the automobile would have been on the south side of the road and two inches in addition. In the second case, all except ten inches of the width of the automobile, or nearly five feet, would have been over on the wrong side of the road. Then in the third case it would have been on the wrong side of the road a distance of approximately 46 inches or

nearly four feet. There can scarcely be any doubt that, in the first and second case, had the truck been wholly on the south side of the road, the impact of the collision would have been just as severe as the impact as it actually was in the case at bar, and the Ford car would have been demolished. That is probably true also in the third of the assumed cases. Consequently, if, with the truck driver not negligent, the impact would have been just as severe or substantially as severe as it actually was, his negligence, if any, could not possibly, it would seem, be said to have contributed to the fatality in this case. The question is discussed in Vol. 2 of the Restatement of the Law of Torts. On page 1162, it is said: "If the same harm, both in character and extent, would have been sustained even had the actor taken the required precautions, his failure to do so is not even a perceptible factor in bringing it (the accident) about and cannot be a substantial factor in producing it." And on page 1163, it is stated: "In order to prevent the actor's negligent conduct from being a substantial factor, it must clearly appear that the required precautions would have proved unavailing or that the harm would have been sustained even had the negligent act not been done." If, in the case at bar, the jury could have found that the collision would not have occurred in substantially the same manner as it did, then it could not, of course, be said, as a matter of law, that the negligence of the truck driver, if any, would not have been a contributing cause. See Leonard vs. Bauer, 112 Colo. 247, 149 Pac. 2d 376. As already indicated, the writer believes that under the assumptions of counsel for the plaintiffs, the jury could probably not have made such finding.

III.  Consolidation of Actions.

Counsel for the plaintiffs complains of the consolidation of the two actions herein and maintains that

the trial court abused its discretion in this connection. Section 3-1710 W. C. S. 1945 provides, among other things:

"When actions of a like nature or involving a substantial common question of law *or fact* are pending before the same court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated;" etc. (Italics supplied.)

The subject is discussed in 1 C. J. S. 1343 and subsequent pages. It is stated on pages 1345-1346 that the question of consolidation of actions "is addressed to the discretion of the court which may either consolidate or refuse to do so, and, as is stated in the title Appeal and Error * * * its action in consolidating, or in refusing to consolidate, cases will not be disturbed, on appeal, in the absence of a manifest abuse of discretion." In this instance, the two cases clearly involved the same questions of fact. The jury could have been instructed separately on the question of damages in the two cases and we see no good reason why all other questions of law, arising either during or after the trial, could not have properly been determined by the court after the consolidation of the actions. We do not think that the court abused its discretion in this case. From what has been heretofore said, the judgment of the district court must be *affirmed.*

RINER, CH. J., and KIMBALL, J., concur, but express no opinion on the question of proximate cause which Justice Blume discusses "without committing the court thereon."